# In the United States Court of Federal Claims

**OFFICE OF SPECIAL MASTERS**

Filed: January 23, 2026

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \*
| | |
|---|---|
| TANDY HAMILTON, | \* |
| | \* |
| | \* |
| Petitioner, | \*   No. 21-2130V |
| | \* |
| v. | \*   Special Master Young |
| | \* |
| SECRETARY OF HEALTH | \* |
| AND HUMAN SERVICES, | \* |
| | \* |
| Respondent. | \* |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

*Courtney Christine Jorgenson*, Siri & Glimstad, LLP, Phoenix, AZ, for Petitioner.
*Ryan Nelson,* U.S. Department of Justice, Washington, DC, for Respondent.

### DECISION ON INTERIM ATTORNEYS' FEES AND COSTS[1]

On December 28, 2024, Tandy Hamilton ("Petitioner") filed a motion for interim attorneys' fees and costs, requesting **$56,833.40** for the work of his former counsel, Mr. Andrew Downing. Pet'r's Mot., ECF No. 43. This amount consists of $55,719.00 in fees and $1,114.40 in costs. *Id.* at 6. On January 27, 2025, Respondent filed his response and objection to Petitioner's motion. Resp't's Response, ECF No. 46. In his response, Respondent stated his opposition, asserting that "[P]etitioner [] failed to provide objective evidence to establish a reasonable basis for his claim" by failing to establish he had met the severity requirement of the Act. *Id.* at 13. Petitioner filed a reply brief on February 3, 2025. Pet'r's Reply, ECF No. 47. For the reasons stated below, I find that Petitioner's claim lacked reasonable basis, and he is therefore not entitled to fees and costs for the entirety of his claim.

---

[1] Because this Decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

## I.   Procedural History

On November 3, 2021, Petitioner filed a petition for compensation in the National Vaccine Injury Compensation Program ("the Program")[2] and a personal statement. Pet., Pet'r's Ex. 1, ECF No. 1. Petitioner alleged that he suffered from thrombocytopenic purpura ("ITP") after receiving the influenza ("flu") vaccine on October 29, 2018. *Id.* He filed medical records on November 14, 2021, and a statement of completion on January 12, 2022. Pet'r's Exs. 1–11, ECF Nos. 6, 9. In response to a status report filed by Respondent, Petitioner filed additional requested medical records on January 4, 2023. Pet'r's Exs. 12–14, ECF No. 18.

On February 13, 2023, Respondent filed his Rule 4(c) report and argued that "there is not preponderant evidence that [P]etitioner suffered the residual effects of his alleged vaccine injury for more than six months after his vaccination on October 29, 2018." Resp't's Report at 13, ECF No. 21. Petitioner filed an affidavit of no records and a statement of completion on February 20, 2023, and February 21, 2023, respectively. ECF Nos. 22–23. In response to Respondent's arguments, Petitioner filed a letter from his treating hematologist on August 30, 2023. Pet'r's Ex. 16, ECF No. 24. On September 6, 2023, Petitioner filed additional medical records. Pet'r's Ex. 17, ECF No. 25. Petitioner also filed a direct rebuttal to Respondent's assertion on September 21, 2023. ECF No. 26. On December 28, 2023, I issued an order noting that "the evidence in the record [was] insufficient to support by preponderant evidence that residual effects or complications of Petitioner's ITP lasted for more than six months." ECF No. 28 at 2.

Petitioner filed medical literature along with a statement from Dr. Thomas Zizac and his own supplemental statement on January 29, 2024. Pet'r's Exs. 18–21, ECF No. 30. Petitioner also filed a response to my order on February 12, 2024. ECF No. 34. Respondent filed a response on March 15, 2024, and Petitioner filed his reply on April 2, 2024.  ECF No. 36; ECF No. 37. The parties filed another round of responses due to the emergence of additional authority with Petitioner filing on May 7, 2024, and Respondent filing his response on May 21, 2024. ECF No 40; ECF No. 41. Petitioner filed a final reply on June 5, 2024. ECF No. 42.

Petitioner filed his motion for interim attorneys' fees and costs on December 28, 2024. Pet'r's Mot. Respondent filed his response on January 27, 2025, noting his objection to reasonable basis, and Petitioner filed his reply on February 3, 2025. Resp't's Response; Pet'r's Reply. On August 21, 2025, I issued a decision in this case finding that Petitioner did not satisfy the Act's severity requirement and therefore denying compensation. ECF No. 49. This matter is now ripe for consideration.

## II.   Summary of Relevant Evidence

### a.   Medical Records

Petitioner was born on November 23, 1951. Pet'r's Ex. 12 at 2. His medical history prior to the 2018 flu vaccination includes bilateral knee osteoarthritis. *See* Pet'r's Ex. 7 at 43. Medical

---

[2] National Childhood Vaccine Injury Act of 1986, Pub L. No. 99-660, 100 Stat. 3755 ("the Vaccine Act" or "Act"). Hereinafter, for ease of citation, all "§" references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

records also indicate that Petitioner had a prior history of ITP as early as 2008. *See* Pet'r's Ex. 11 at 285. On September 4, 2018, Petitioner saw Dr. James Y. Choi, a hematologist at the Virginia Piper Cancer Center, for evaluation of normocytic anemia.[3] Pet'r's Ex. 3 at 4. Petitioner's bloodwork, dated August 15, 2018, revealed a normal white blood cell count and platelet level. *Id.* Petitioner returned to Dr. Choi on September 19, 2018, and his lab results showed both an iron deficiency and low vitamin B12. Pet'r's Ex. 3 at 35. Records from this appointment also noted a past medical history of ITP. Pet'r's Ex. 10 at 6. Dr. Choi recommended that Petitioner undergo total IV iron replacement therapy and start oral vitamin B12 supplements. Pet'r's Ex. 3 at 35. Dr. Choi also noted that Petitioner had bleeding hemorrhoids[4] which were likely the source of his iron deficiency and referred him to a colorectal surgeon. *Id.* Petitioner underwent total IV iron replacement therapy on September 24, 2018. *Id.* at 64.

On October 10, 2018, Petitioner saw a colorectal surgeon, Dr. Jason Weiss. Pet'r's Ex. 10 at 9. Petitioner reported that he had been dealing with hemorrhoids for several years and an examination revealed prolapsing left lateral and right posterior mixed hemorrhoids and weak sphincter tone. *Id.* at 9–10. Dr. Weiss recommended a hemorrhoidectomy[5] due to the large size of the hemorrhoids. *Id.* at 11.

Petitioner received an intramuscular flu vaccination on October 29, 2018. Pet'r's Ex. 2 at 2.

On November 6, 2018, Petitioner had a follow-up appointment with Dr. Choi. Pet'r's Ex. 3 at 63–64. Labs from November 1, 2018, showed improved iron levels, low vitamin B12 levels, and normal platelets. *Id.* at 64–69. Petitioner went to Banner Urgent Care on November 10, 2018, with a complaint of blood blisters in his mouth. Pet'r's Ex. 9 at 13. He was directed to follow up with his primary care provider ("PCP") and hematologist. *Id.* at 15. Two days later, on November 12, 2018, Petitioner saw nurse practitioner ("N.P."), Krista Hawkins, at his PCP's office. Pet'r's Ex. 3 at 274. Petitioner reported a three-day history of a bleeding mouth ulcer. *Id.* Petitioner declined a blood draw at his PCP's office and planned to see his hematologist or seek emergency care. *Id.* at 276. Later that same day, Petitioner presented to the Banner Thunderbird Medical Center Emergency Department ("ED"). Pet'r's Ex. 11 at 285. His chief complaint was a three-day history of mouth blisters. *Id.* Petitioner also reported that he had ITP after a knee surgery in 2008, and that "he went to his hematologist [two] weeks ago because his platelets were low." *Id.* On examination, multiple hemorrhagic bullae[6] were noted inside his mouth. *Id.* at 286. His platelet

---

[3] Normocytic anemia is "anemia with erythrocytes of normal size but a proportionate decrease in hemoglobin content, packed red cell volume, and a number of erythrocytes per cubic millimeter of blood. *Normocytic Anemia*, DORLAND'S MED. DICTIONARY ONLINE, https://www.dorlandsonline.com/dorland/definition?id=56179 (hereinafter, "DORLAND'S");  Anemia is "a reduction below normal in the concentration of erythrocytes or hemoglobin in the blood, . . . it occurs when the equilibrium is disturbed between blood loss . . .  and blood production." *Anemia*, DORLAND'S. An erythrocyte is "one of the elements found in peripheral blood." *Erythrocyte*, DORLAND'S. Hemoglobin is "the red oxygen-carrying pigment of erythrocytes." *Hemoglobin*, DORLAND'S.

[4] A hemorrhoid is a "prolapse of an anal cushion, resulting in pleading and painful swelling in the anal canal." *Hemorrhoid*, DORLAND'S.

[5] A hemorrhoidectomy is the "excision of hemorrhoids." *Hemorrhoidectomy* DORLAND'S.

[6] A bulla is "a large blister." *Bulla*, DORLAND'S.

count was low at 1 K/MM3. *Id.* at 287. Petitioner was admitted to the hospital to start intravenous immunoglobulin[7] ("IVIG") and an oral prednisone course. *Id.*

Hematologist, oncologist, and associate of Dr. Choi, Dr. Joan M. Dahmer, provided a consult on November 12, 2018. Pet'r's Ex. 11 at 275. Dr. Dahmer wrote that Petitioner's ITP "was possibly triggered by the flu shot, but I am keeping an open mind." *Id.* at 276. Dr. Dahmer also noted that Petitioner's hemoglobin levels were not low enough to explain fatigue, and suspected Petitioner's low iron levels to be a contributor. *Id.* A November 14, 2018 progress note from Dr. Dahmer noted that Petitioner was "[a]sking about banding 'since they can't do surgery.' I think unless there is substantial bleeding from those hemorrhoids, that any procedure should wait for stabilization [sic] of his [platelet] count." *Id.* at 257–58. Petitioner was discharged on November 16, 2018. *Id.* at 271. His mucosal bleeding was resolved, and his platelet count had increased to 18,000. *Id.* at 271, 274.

On November 20, 2018, follow-up bloodwork at the ED recorded Petitioner's platelets had decreased to 2,000 with no present bleeding. Pet'r's Ex. 11 at 415, 622. Petitioner was admitted to the hospital for another round of IVIG and ordered to start Rituxan.[8] *Id.* at 621. Due to his hemorrhoidal bleeding, Petitioner received one unit of platelets on November 22, 2018. *Id.* at 617. Petitioner was discharged on November 24, 2018, with a platelet count of 29, 000. *Id.* at 381, 620.

Following this hospitalization, Petitioner saw Dr. Choi on November 27, 2018. Pet'r's Ex. 3 at 89. Dr. Choi described Petitioner as having "now steroid refractory ITP" and recommended that Petitioner receive rituximab weekly for four weeks. *Id.* at 90. Dr. Choi also noted that Petitioner, "ha[d] bleeding hemorrhoids and [would] require treatment with his colorectal surgeon once the thrombocytopenia issue [was] resolved." *Id.* Petitioner's rituximab therapy began on November 21, 2018, and was completed on December 12, 2018. Pet'r's Ex. 3 at 150. Records from a follow-up with Dr. Choi on December 19, 2018, documented that Petitioner's platelet counts were "now normalized" at 173,000. *Id.* at 158. Dr. Choi's office faxed a copy of this December 19, 2018 record to Petitioner's colorectal surgeon, Dr. Weiss, later that day. *See* Pet'r's Ex. 14 at 23–25. Dr. Choi requested Petitioner return in two months, and Petitioner was directed to call if he developed any bruising, rashes, bleeding, or petechiae.[9] *Id.* at 150.

The next day, on December 20, 2018, Petitioner received a call and voicemail from Dr. Weiss's office to schedule an appointment. Pet'r's Ex. 14 at 8. The following day, on December 21, 2018, Petitioner saw N.P. Hawkins. Pet'r's Ex. 3 at 272. N.P. Hawkins noted Petitioner's recent hospitalization and that a "specialist [was] concerned that [the flu] vaccine led to these events." *Id.* On February 20, 2019, Petitioner returned to see Dr. Choi with a platelet count that had "remain[ed] normalized" at 275,000. *Id.* at 186–88. Dr. Choi noted that Petitioner "ha[d] bleeding

---

[7] Immunoglobulin refers to "any of the structurally related glycoproteins that function as antibodies." *Immunoglobulin*, DORLAND'S.

[8] Rituxan is a "trademark for a preparation of rituximab." *Rituxan*, DORLAND'S. Rituximab is "a chimeric murine/human monoclonal antibody that binds the CD 20 antigen." *Rituximab*, DORLAND'S. Hereinafter, I will refer to Petitioner's course of treatment as "rituximab" unless specifically quoting a source that references Rituxan.

[9] Petechia is "a pinpoint, nonraised, perfectly round, purplish red spot caused by intradermal or submucous hemorrhage." *Petechia*, DORLAND'S.

hemorrhoids and [would] require treatment with his colorectal surgeon. [Petitioner] state[d] he [would] contact the surgeon when he [was] ready." *Id.* at 187. Petitioner's ITP history was documented in PCP visit records on March 13, 2019, and he denied easy bruising or excessive bleeding. *Id.* at 269. This visit, along with others in May, was not related to Petitioner's ITP, although it was always similarly noted in his medical history. *Id.* at 270, 271; Pet'r's Ex. 4 at 6.

On August 19, 2019, Petitioner called his hematologist's office to report that he was "going to schedule his hemorrhoid surgery." Pet'r's Ex. 12 at 2. Petitioner wanted "to know if he should get his blood checked and if any other special precautions should be taken before he schedules." *Id.* Dr. Choi ordered a comprehensive metabolic panel, iron, total iron binding capacity, and iron saturation labs. *Id.* at 6–9. Petitioner saw Dr. Choi on August 20, 2019, who noted that Petitioner's platelet count "remain[ed] normalized." Pet'r's Ex. 14 at 16–17.

Petitioner underwent a left lateral hemorrhoidectomy on September 4, 2019. Pet'r's Ex. 14 at 14. Dr. Weiss noted Petitioner's ITP and that his platelet count was at "219[,000] on August 19, 2019." *Id.* at 6. On September 17, 2019, Petitioner presented for a post-hemorrhoidectomy appointment with Dr. Weiss. Pet'r's Ex. 4 at 199. Dr. Weiss noted that Petitioner's bleeding post-surgery had resolved, and that his platelets and hemoglobin were higher than before surgery. *Id.* An October 22, 2019, "phone note" indicated that Petitioner called Dr. Weiss to report some discomfort and rectal bleeding. Pet'r's Ex. 14 at 4. Petitioner was advised this could be because the wounds had not completely healed, and he deferred an in-person appointment. *Id.*

On February 6, 2020, Petitioner saw Dr. Kevin Houlihan for an annual examination. Pet'r's Ex. 13 at 34. Under his history of present illness, Dr. Houlihan recorded that Petitioner "developed a flare of ITP after receiving this season's flu vaccine. Would like to hold off on other vaccines at this time until he speaks with his [h]ematologist, Dr. Choi." *Id.* Dr. Houlihan further noted that Petitioner "present[ed] with a diagnosis of thrombocytopenic purpura. This was diagnosed years ago. The course ha[d] been episodic. It is of severe intensity. Platelet counts dropped to 1[,000] with this season's flu vaccine." *Id.* Routine labs, taken at Dr. Houlihan's direction, were collected on February 6, 2020. *Id.* at 86. Petitioner's platelet count was normal at 253,000. *Id.* Petitioner also sought unrelated treatment for his left shoulder through April of 2020. *Id.* at 107. A note from Petitioner's August 17, 2020 telehealth appointment with Dr. Houlihan recorded Petitioner's ITP history and listed his status as "uncertain." *Id.* at 28–29. The purpose of this call was unrelated to his ITP. *Id.*

About six months later, on February 8, 2021, Petitioner presented for a follow-up visit with Dr. Houlihan. Pet'r's Ex. 13 at 21. His ITP was again listed in his "Past Medical History." *Id.* Routine labs, which were collected on February 8, 2021, revealed that Petitioner's platelet count was normal at 182,000. *Id.* at 79. Labs were repeated on December 6, 2021, and Petitioner's platelet count remained normal at 227,000. *Id.* at 76. Repeat labs were completed on March 4, 2022, and Petitioner's platelet count remained in normal range at 189,000. *Id.* at 72. Petitioner's most recently filed platelet count is from September 28, 2022, and it recorded a normal platelet count at 195,000. *Id.* at 67.

### b. Petitioner's Sworn Statement

Petitioner submitted a sworn statement dated November 2, 2021. *See generally* Pet'r's Ex. 1. Petitioner averred that his "surgeon continued to delay [his] surgery for [his] hemorrhoids because of the potential complications due to ITP." *Id.* at ¶ 7. Petitioner also averred that he "continued to suffer from anemia due to the bleeding," and that even after concluding his medication, he had stiff and painful joints "for probably another six months after the infusions." *Id.* He continued that his doctor "indicated this was a side effect of the medications." *Id.* Finally, Petitioner averred that he was "not able to have the corrective surgery on [his] hemorrhoids until October 2019 – the delay of which and [his] continuing symptoms were directly attributable to [his] ITP." *Id.* at 3.

On February 12, 2024, Petitioner filed a supplemental statement to clarify the circumstances surrounding his delayed colorectal surgery. *See generally* Pet'r's Supp. Statement, ECF No. 34. Petitioner explained that although as of February 20, 2019, his "platelets were above the bottom line for normal, they were still fluctuating." *Id.* at 3. He recounted the two issues that Dr. Choi identified with Petitioner "having [his] prior scheduled surgery." *Id.* Due to Petitioner's platelet fluctuation, Dr. Choi "said he thought [Petitioner] should wait a few months before getting the surgery just to be safe." *Id.* Additionally, "the surgery was contraindicated within six months of concluding [r]ituximab therapy." *Id.* Petitioner averred that as a direct consequence of his ITP, he "waited over six months after the conclusion of [his] [r]ituximab therapy before [he] started the process to have [] surgery." *Id.* He concluded that his bloodwork on August 19, 2019, six months after the conclusion of his rituximab, showed a platelet count within normal range; and his surgery was performed on September 4, 2019. *Id.*

### c. Physician Letters

On August 30, 2023, Petitioner filed a letter dated August 28, 2023, from his treating hematologist, Dr. Choi. Pet'r's Ex. 16. Dr. Choi's one page statement explained that "[d]ue to the persistent thrombocytopenia, [Petitioner] had hemorrhoidal surgery that had to be delayed until a higher level was achieved." *Id.* Dr. Choi continued that Petitioner's rituximab therapy, "was completed on 12/12/2018 with subsequent resolution of the thrombocytopenia." *Id.*

Petitioner also filed a statement from Dr. Thomas Zizac.[10] Pet'r's Ex. 21. Dr. Zizic is an Associate Professor of Medicine at Johns Hopkins University. *Id.* at 1. He was previously their Associate Director of Rheumatic Disease. *Id.* Dr. Zizac is also "a founding fellow of the American College of Rheumatology." *Id.* He received his medical degree from Johns Hopkins and completed his internship and residency there in internal medicine. *Id.* Dr. Zizac was a rheumatology post-doctoral fellow at Johns Hopkins before serving "as a flight surgeon at the School of Aerospace Medicine at Brooks Airforce Base, San Antonio, Texas." *Id.* He had a private practice in rheumatology for fifteen years before joining academia full time. *Id.* Dr. Zizac is a past President of the Maryland Society of Rheumatic Disease, and he has "published approximately 100 articles

---

[10] Petitioner did not file Dr. Zizac's CV; however, his sworn statement details his relevant experience and authority. Additionally, Dr. Zizac was not one of Petitioner's treating physicians, but was retained to provide this letter regarding Petitioner's statements.

and abstracts in peer reviewed journals as well as several dozen chapters in textbooks of medicine." *Id.*

Dr. Zizac conceded that "he ha[d] not reviewed [Petitioner's] medical chart," and noted that his statement is not offered to "give an expert opinion" on causation. Pet'r's' Ex. 21 at ¶ 4. Dr. Zizac did review Petitioner's supplemental statement and asserted that "the American College of Rheumatology guidelines recommend a six-month waiting period after the last Rituximab dosage prior to undergoing elective surgery." *Id.* In support of this contention, Dr. Zizac relied on an article discussing perioperative immunosuppressive use, and guidelines for perioperative management of antirheumatic medication. *Id.* He argued that "surgery in close proximity to completion of [r]ituximab therapy is contraindicated." *Id.* (emphasis omitted).

### d.  Medical Literature

The Micheal & Auron[11] article filed by Petitioner, "highlight[ed] the peri-operative immunosuppressive management and doses suggested for patients with rheumatic diseases." Pet'r's Ex. 19 at 1. The authors explained that rituximab is a monoclonal antibody that is used to treat many conditions, including the chronic diseases: rheumatoid arthritis, lupus, and vasculitis. *Id.* at 4. One side effect of the therapy is "B cell depletion within [two] to [three] weeks after a dose." *Id.* at 4. While B cell levels will eventually normalize after treatment, "[p]atients may experience a significant drop in immunoglobulin levels, which remains for up to six months after initiating rituximab." *Id.* This could potentially leave rituximab patients more susceptible to infection during this period if they undergo an operation. *Id.* Noting the "scant data about the use of rituximab in the perioperative period," the authors referenced the Goodman et al.[12] article's suggestion to monitor "IgG levels, at least 100 days after rituximab dose, and if levels normalize, then proceed further with elective surgery." *Id.* at 5 *(citing* Pet'r's Ex. 20). The authors cautioned that "[i]f levels remain abnormal, then administration of [IVIG] is advised prior to surgery." *Id.*

The Micheal & Auron article referenced "the American College of Rheumatology 2017 Guideline, recommend[ing] a [six]-month wait period after the last rituximab dose, to schedule elective hip or knee surgery." Pet'r's Ex. 19 at 5. Likewise filed by Petitioner, Goodman et al. noted that the evidence-based guideline is for "management of antirheumatic drug therapy for adults with rheumatoid arthritis ("RA"), spondylarthritis ["SpA"], juvenile idiopathic arthritis ("JIA"), or systemic lupus erythematosus ("SLE")." Pet'r's Ex. 20 at 2. The authors specified that the "guideline is to be used for those who have elected and have been deemed appropriate candidates for [hip or knee surgery]. We would caution against extrapolation of this guideline to other orthopedic procedures until further data are available." *Id.* at 3. Furthermore, "[t]his guideline does not address . . . medical decisions unrelated to antirheumatic drug therapy . . . or perioperative evaluation and management of concurrent disease." *Id.* The authors explained that "[p]atients with rheumatic diseases undergoing total hip arthroplasty and total knee arthroplasty are at increased

---

[11] Madonna Michael & Moises Auron, *Perioperative Immunosuppressive Use in Patients with Rheumatologic Diseases*, 3 J. XIANGYA MED. 38 (2018).

[12] Susan M. Goodman et al., *2017 American College of Rheumatology/American Association of Hip and Knee Surgeons Guideline for the Perioperative Management of Antirheumatic Medication in Patients with Rheumatic Diseases Undergoing Elective Total Hip or Total Knee Arthroplasty*, 69 ARTHRITIS CARE & RESEARCH 1111 (2017).

risk for periprosthetic joint infection." *Id.* "Biologic medications[, including rituximab,] should be withheld as close to [one] dosing cycle as scheduling permits prior to the elective [surgeries] and restarted after evidence of wound healing, typically 14 days, for all patients with rheumatic disease." *Id.* at 6. For example, "[p]atients treated with rituximab every [six] months would schedule their surgery, when possible, at the week after the first withheld dose during month [seven]. *Id.* at 7. In making this recommendation, Goodman et al. explained:

> [A] systematic review, meta-analysis, and network meta-analysis revealed that infection risk for biologic agents is strongly associated with high-dose therapy (higher dose than the standard) and may not be associated with low-dose biologic agents, so serum half-life may not correspond to the duration of the immunosuppressant effect. The dosing cycle was therefore chosen as more relevant in determining the withholding interval and timing the surgery at the end of the dosing interval at the nadir of the drug effect.

*Id.* at 6.

## III.    Parties' Arguments[13]

### a.  Petitioner's Motion for Interim Attorneys' Fees & Costs

On December 28, 2024, Petitioner filed a motion for interim attorneys' fees and costs in which he argued his claim had reasonable basis. He argued that his flu vaccination caused him to develop ITP; and consequently, his previously scheduled colorectal surgery was canceled and delayed during his rituximab treatment and recovery. Pet'r's Mot. at 5. Petitioner continued that his "platelets [were] still fluctuating, which caused both his PCP and surgeon concern, but also an elective surgery within six months of Rituximab therapy [was] contraindicated." *Id.* Petitioner referenced the letter written by Dr. Zizic,[14] who opined that Petitioner must have been following the advice of his treating physicians given that such elective surgeries are contraindicated six months after completed rituximab therapy. *Id.* at 6. He asserted that despite "the pending dispute over the six month severity requirement, [] certainly good faith and reasonable basis are present." *Id.* Petitioner further contended that he suffered from stiff joints two weeks after his last dose of rituximab on December 12, 2018, which persisted for six months. *Id.* at 4–5.

### b.  Respondent's Response to Petitioner's Motion

In Respondent's response to Petitioner's motion, Respondent noted two separate objections to reasonable basis: 1) that Petitioner had not met the severity requirement under the Act because he had not established that he suffered sequela of his injury for more than six months; and 2) that Petitioner had not met the severity requirement under the Act because he did not undergo a surgical

---

[13] Both parties rely heavily on arguments made in their previous briefs regarding the severity requirement (ECF Nos. 34, 36, 37, 40, 41, 42) and consistently cite back to those briefs for further explanation of their argument in lieu of re-explaining the contours of their argument here. Because I have already addressed the merits of these arguments in my decision in this case, I will only repeat the arguments made by the parties in their briefs regarding reasonable basis. *See* ECF No. 49.

[14] Dr. Zizac admitted that he did not review any of Petitioner's medical records and instead relied solely on his sworn statements. *See* Pet'r's Ex 21.

intervention. Resp't's Response at 8, 10. First, Respondent argued that "Petitioner's assertion that his hematologist Dr. Choi told him to wait six months before his surgery . . . is not supported by the record. On February 20, 2019, three months, [22] days after vaccination, Dr. Choi instructed [P]etitioner to contact his surgeon to schedule surgery." *Id.* at 9. Respondent also argued there was no statement in the record from Dr. Choi confirming that he advised Petitioner to postpone his surgery for six months. *Id.* Respondent also argued that although Petitioner claimed to have suffered from stiff joints for six months following his rituximab treatment, "there is no objective evidence showing that [P]etitioner's ITP persisted for six months after vaccine administration." *Id.* at 9–10.

Second, Respondent contested the argument Petitioner introduced in his supplemental authority brief that Petitioner's IVIG treatment constituted a surgical intervention sufficient to satisfy the severity requirement of the Act. Resp't's Response at 10. Respondent noted that this Court had previously found IVIG not to be a surgical procedure in *Spooner*, where the special master instead found it to be a nursing function. *Id.* (citing *Spooner v. Sec'y of Health & Hum. Servs.*, No. 13-159V, 2014 WL 504728, at *13 (Fed. Cl. Spec. Mstr. Jan. 16, 2014)).

> Because the administration of [IVIG] was not performed by a surgeon or even a medical doctor, did not involve the insertion of a specialized instrument to remove tissue, did not require general anesthesia, did not require a surgical consent form, did not result in a surgical report, was not performed in an operating room, and did not require recovery in the post-surgical care unit, it is abundantly clear that [P]etitioner did not undergo a surgical procedure.

*Id.* (citing *Spooner*, 2014 WL 504728, at *12 (noting that whether a procedure is surgical can be determined by whether the providing hospital treated it as surgical)).

Because Petitioner had failed to establish he had met the severity requirement of the Act, Respondent argued that caselaw allowed for a denial of attorneys' fees and costs for a lack of reasonable basis. Resp't's Response at 10 (citing *Contreras v. Sec'y of Health & Hum. Servs.*, No. 19-491V, 2022 WL 2302208 (Fed. Cl. Spec. Mstr. May 31, 2022)).

### c.  Petitioner's Reply to Respondent's Response

In his reply, Petitioner characterized Respondent's objection to reasonable basis as "a half-hearted regurgitation of his prior briefing in this case," and noted that "whether the Court chooses to agree with Petitioner on severity and entitlement is a question for another day." Pet'r's Reply at 1. Petitioner argued that the allegations in the petition "were verified by under-oath testimony from [] Petitioner" in the form of two sworn statements. *Id.* at 1–2 (citing Pet'r's Exs. 1, 18). Petitioner argued that his statements were "absent" from Respondent's briefing, and that "there is nothing vague about any of [Petitioner's] statements, particularly when the question in (sic) onset and severity." *Id.* at 3. "While [Respondent] would like to ignore under-oath testimony, the Court cannot, as it is clear, objective evidence supporting reasonable basis." *Id.*

Petitioner then cited to *James-Cornelius v. Sec'y of Health & Hum. Servs.* to support his argument that sworn testimony is sufficient objective evidence to satisfy reasonable basis. *See* 984 F.3d 1374, 1380 (Fed. Cir. 2021).

> While lay opinions as to causation or medical diagnosis may be properly characterized as mere "subjective belief" when the witness is not competent to testify on those subjects, the same is not true for sworn testimony as to facts within the witness's personal knowledge, such as the receipt of a vaccine and the timing and severity of symptoms. . . . Indeed, for many medical symptoms or events—such as a headache or other pain, dizziness, nausea, and vomiting—the patient's or a parent's testimony may be the best, or only, direct evidence of their occurrence. Medical records related to those symptoms would likely be based on the statements of those who experienced them. And while such medical records may indeed serve as important corroborating evidence for evaluating testimony's credibility, we reject the Special Master's broad pronouncement that petitioners' affidavits are categorically "not 'objective' for purposes of evaluating reasonable basis."

*Id.* Accordingly, Petitioner argued that where a petitioner has submitted a sworn statement and "medical records show that recovery is feasible," reasonable basis is satisfied. Pet'r's Reply at 4 (citing *Santacroce v. Sec'y of Health & Hum. Servs.*, 15-555V, 2018 WL 405121 (Fed. Cl. Spec. Mstr. Jan. 5, 2018)). Petitioner then pointed to the letter from Dr. Choi and argued that "Dr. Choi corroborates [Petitioner's] under-oath testimony that the surgery was delayed [] due to his ITP." *Id.* (citing Pet'r's Ex. 16). Petitioner also relied on the statement provided by Dr. Zizic, who opined that "surgery in close proximity to completion of Rituximab therapy is contraindicated," and thus found that Petitioner's supplemental statement was "medically and scientifically appropriate." *Id.* at 5–6 (citing Pet'r's Ex. 21, ¶¶ 5, 9). "Clearly, the surgery that would have fixed the underlying medical issue was cancelled because his platelet levels had fallen below the safe level for surgery," an assertion Petitioner argued was supported by the testimony of himself, Dr. Choi, Dr. Zizic, and the medical record. *Id.* at 6. Petitioner argued this delay in surgery pushed Petitioner "well beyond six months following vaccination, even if you assume that his platelets had normalized." *Id.* at 6–7.

## IV.   Applicable Legal Standard

To obtain attorneys' fees pursuant to a Vaccine Act claim, the petitioner must have a reasonable basis to support all elements of the claim for which the petition is brought. *Cottingham ex rel. K.C. v. Sec'y of Health & Hum. Servs.*, 971 F.3d 1337, 1345–46 (Fed. Cir. 2020) (citing 42 U.S.C. §§ 300aa11(c)(1), 300aa-15(e)(1)). This includes providing objective evidence for the severity requirement of the Act. *Contreras*, 2022 WL 2302208, at *7.

To show reasonable basis, a petitioner must show more than just his belief in his claim. *Turner v. Sec'y of Health & Hum. Servs.*, No. 99-544V, 2007 WL 4410030, at *6–7 (Fed. Cl. Spec. Mstr. Nov. 30, 2007). Reasonable basis is deemed "an objective test, satisfied through objective evidence." *Cottingham*, 971 F.3d at 1344. "The reasonable basis requirement examines 'not at the likelihood of success [of a claim] but more to the feasibility of the claim." *Turner*, 2007 WL

4410030, at *6 (quoting *Di Roma v. Sec'y of Health & Hum. Servs.*, No. 90-3277V, 1993 WL 496981, at *1 (Fed. Cl. Spec. Mstr. Nov. 18, 1993)).

While the statute does not define the quantum of proof needed to establish reasonable basis, it is "something less than the preponderant evidence ultimately required to prevail on one's vaccine-injury claim." *Chuisano v. Sec'y of Health & Hum. Servs.*, 116 Fed. Cl. 276, 283 (2014). The Federal Circuit has affirmed that "more than a mere scintilla but less than a preponderance of proof could provide sufficient grounds for a special master to find reasonable basis." *Cottingham*, 971 F.3d at 1346 (finding Petitioner submitted objective evidence supporting causation when she submitted medical records and a vaccine package insert and clarifying that "the failure to consider objective evidence presented in support of a reasonable basis for a claim would constitute an abuse of discretion"). Indeed, determining what constitutes "more than a mere scintilla" is a "daunting task." *Cottingham v. Sec'y of Health & Hum. Servs.*, No. 15-1291V, 2021 WL 3085502, at *13 (Fed. Cl. Spec. Mstr. July 21, 2021).

While the Court in *Cottingham* did not purport to identify all forms of objective evidence reflective of reasonable basis, it stated that "objective medical evidence, including medical records . . . even where the records provide only circumstantial evidence of causation" can support a showing of reasonable basis. *Cottingham*, 971 F.3d at 1346 (citing *Harding v. Sec'y of Health & Hum. Servs.*, 146 Fed. Cl. 381, 403 (2019)). The *Cottingham* Court also reiterated that the reasonable basis determination is still based on a "totality of the circumstances." *Id.*

When determining if a reasonable basis exists, many special masters and judges consider a myriad of factors. The factors to be considered may include "the factual basis of the claim, medical and scientific support for the claim, the novelty of the vaccine, and the novelty of the theory of causation." *Amankwaa v. Sec'y of Health & Hum. Servs.*, 138 Fed. Cl. 282, 289 (2018). This approach allows the special master to look at each application for attorneys' fees and costs on a case-by-case basis. *Hamrick v. Sec'y of Health & Hum. Servs.*, No. 99-683V, 2007 WL 4793152, at *4 (Fed. Cl. Spec. Mstr. Nov. 19, 2007).

In another recent opinion regarding reasonable basis, the Federal Circuit stated affidavits and sworn testimony, when taken together with corroborating medical records, could be considered objective evidence supporting reasonable basis. *James-Cornelius*, 984 F.3d at 1381 (explaining that "[w]hen taken together with the corroborating medical records . . . the factual testimony provided by [the petitioner] amount to relevant objective evidence for supporting causation"). The Circuit further clarified that "absence of an express medical opinion on causation is not necessarily dispositive of whether a claim has reasonable basis." *Id.* at 1379 (citing *Cottingham*, 971 F.3d at 1346). The Court of Federal Claims has interpreted the opinion in *James-Cornelius* to require special masters to consider such affidavits and testimony when applying the totality of the circumstances test, though it has not held the mere existence of such testimony to be sufficient to satisfy the objective evidence requirement of reasonable basis. *See Goodgame v. Sec'y of Health & Hum. Servs.*, 157 Fed. Cl. 62, 73 (2021) (upholding a denial of reasonable basis because "[p]etitioner's affidavit cannot be 'taken together with the corroborating medical records included in the petition' such that it 'amount[s] to relevant objective evidence" (citing *James-Cornelius,* 984 F.3d at 1381)); *see also Hohenstein v. Sec'y of Health & Hum. Servs*, No. 19-1222,

11

2023 WL 9179566, at *4 (Fed. Cl. Dec. 21, 2023) (interpreting *James-Cornelius* as to require the special master to "weigh all the evidence on record").

At issue here, Vaccine Act Section 11(c)(1)(D)(i) requires the establishment of an injury and either residual effects lasting for over six months after the date of vaccination or the presence of hospitalization and surgical intervention. This is a threshold requirement for entitlement. *Black v. Sec'y of Health & Hum. Servs.*, 33 Fed. Cl. 546, 550 (1995) (reasoning that the "potential petitioner" must not only make a *prima facie* case, but clear a jurisdictional threshold, by "submitting supporting documentation which reasonably demonstrates that a special master has jurisdiction to hear the merits of the case"), *aff'd*, 93 F.3d 781 (Fed. Cir. 1996) (internal citations omitted).

## V.    Discussion

Given that Petitioner received the vaccine at issue on October 29, 2018, he needed to provide objective evidence that he either 1) suffered the residual effects or complications for more than six months after the administration of the vaccine, until at least April 29, 2019; or 2) suffered such illness, disability, injury, or condition from the vaccine which resulted in inpatient hospitalization and surgical intervention. *See* §§ 11(c)(1)(D)(i) and (iii). As explained below, I find that Petitioner has not provided objective evidence to support either of these requirements, and thus he has not met the reasonable basis requirement for an award of attorneys' fees and costs.[15]

Petitioner placed heavy reliance on his own testimony to support the six-month severity requirement of the Act. He argued that these allegations are "verified by under-oath testimony from Petitioner," and they should amount to objective evidence sufficient for reasonable basis because "[t]here are clearly multiple under-oath statements and corroborating medical records that support a reasonable basis for linking vaccination with the injury." Pet'r's Reply at 1–4. However, the issue is not whether Petitioner's injury has been linked to his surgery, but rather whether Petitioner has satisfied the six-month severity requirement. The parties disagree on how to identify objective evidence of reasonable basis in the record. *James-Cornelius* instructs special masters to consider Petitioner's statements along with the medical records. 984 F.3d at 1381. However, it does not hold that the act of filing these two types of evidence is sufficient to establish reasonable basis of a claim without a showing that this record contains at least a mere scintilla of objective evidence that Petitioner's injury lasted six months. Indeed, such an interpretation would undercut the Vaccine Act itself, as well as a substantial portion of prior caselaw establishing the standard and factors to consider for a reasonable basis inquiry. *See Perreira v. Sec'y of Health & Hum. Servs.*, 33 F.3d 1375, 1377 (Fed. Cir. 1994) ("Congress must not have intended that every claimant, whether being compensated or not under the Vaccine Act, collect attorney fees and costs by merely having expert state an unsupported opinion that the vaccine was the cause in-fact of the injury. The

---

[15] Due to the issues presented in this case, the evidence considered here is largely the same evidence considered in my prior decision denying entitlement. However, the standard for a decision on entitlement is much higher (by a preponderance of the evidence) than the standard for a decision on reasonable basis (more than a mere scintilla but less than a preponderance of proof). *See Cottingham*, 971 F.3d at 1346. Even under this significantly lower standard, Petitioner has failed to meet his burden to satisfy reasonable basis.

words of the statute require more."); *see also Stratton v. Sec'y of Health & Hum. Servs.*, No. 20-1515, 2026 WL 25966, at *7 (Fed. Cl. Jan. 5, 2026) (holding that "[s]ince the Vaccine Act prohibits findings based on the claims of a petitioner alone, the Chief Special Master properly concluded [Petitioner's] unsubstantiated Declaration was insufficient to establish a reasonable basis for her claim"); 42 U.S.C. § 300aa-13(a)(1)(B). Accordingly, to satisfy reasonable basis under *James-Cornelius* and current reasonable basis jurisprudence, a petitioner must show that any affidavits and sworn testimony provided in the record constitutes "more than a mere scintilla" of objective evidence ***when taken together with corroborating medical records***. 984 F.3d at 1381; *see also Cottingham*, 971 F.3d at 1346.

This is how the Court of Federal Claims applied the Federal Circuit's guidance in *James-Cornelius* to *Goodgame v. Sec'y of Health & Hum. Servs.*, another case involving a reasonable basis decision premised on the six-month severity requirement of the Act. *See* 157 Fed. Cl. 62 (2021). In *Goodgame*, the respondent challenged whether the petitioner had satisfied the six-month severity requirement, and the petitioner responded by filing an amended petition stating her symptoms lasted longer than six months, but she did not file medical records to corroborate that statement. *Id.* at 65–66. After the special master denied reasonable basis, the Court of Federal Claims upheld the decision on review. *Id.* at 74. "[G]iven the lack of medical evidence to substantiate Petitioner's claim, whether her affidavit was more than a mere scintilla of evidence is beside the ultimate point." *Id.* at 69. The Court contrasted *Goodgame* with *James-Cornelius*, specifically noting that the significance of the affidavits in *James-Cornelius* was that they were supported by the medical record, whereas those in *Goodgame* were not. *Id.* Additionally, the Court in *Goodgame* went to greater lengths to distinguish it from *James-Cornelius*, noting that that case was about causation, while *Goodgame* was about severity. *Id.* at 73–74.

> In the instant case, for which the question at issue is the duration of the residual effects of Petitioner's alleged injury, the Special Master determined, and the record reflects the fact, that there was no medical evidence supporting the claim that the alleged injury lasted at least six months. The medical evidence in this case is simply not analogous to the evidence in *Cottingham* and *James-Cornelius*. In those cases, the petitioner's medical records supported a vaccine-related causation for their injuries. Here, Petitioner's medical records do not substantiate, and likely actually refute, the allegation that the residual effects of her alleged vaccine injury lasted at least six months.

*Id.* Ultimately, the Court found that the "the medical records here do not even provide circumstantial evidence that the residual effects of Petitioner's injury lasted more than six months;" thus, unlike *James-Cornelius*, "Petitioner's affidavit cannot be taken together with the corroborating medical records included in the petition such that it amounts to relevant objective evidence." *Id.* at 74 (internal citation omitted).

Turning to the instant case, it is more analogous to *Goodgame* than *James-Cornelius*. The corroborating medical records Petitioner cited to in his brief are the August 28, 2023 letter from Dr. Choi, the filed expert opinion from Dr. Zizic, and the November 14, 2018 medical record, noting that Petitioner's surgery was "on hold" due to his ITP. *See* Pet'r's Ex. 11 at 257. However, these records and Petitioner's own statements, when taken together with the entire record, do not

constitute objective evidence supporting a reasonable basis that his symptoms continued for six months following vaccination.

First, Petitioner asserted that he waited to schedule his surgery at the behest of his treater, Dr. Choi. In support of said assertion, Petitioner offered a six-month chronology between his February follow-up and his August call scheduling the surgery. However, a review of these records from Dr. Choi and the letter that he submitted does not reveal evidence that he told Petitioner to wait until September for his surgery. The medical records provide the following timeline:

| Date | Event | Pet'r's Ex. |
| --- | --- | --- |
| November 21, 2018 | Petitioner begins rituximab. | 3 at 150. |
| December 12, 2018 | Petitioner ends rituximab. | 3 at 150. |
| December 19, 2018 | Dr. Choi characterized Petitioner's platelet count as "now normalized" at 173,000.<br>Dr. Choi faxed a record of Petitioner's count to Dr. Weiss. | 14 at 23. |
| December 20, 2018 | Dr. Weiss called Petitioner and left voicemail for him to schedule an appointment. | 14 at 8. |
| February 20, 2019 | Dr. Choi noted that Petitioner's platelet count "remained normalized" at 275,000.<br>Dr. Choi noted that Petitioner will require treatment with his surgeon.<br>Petitioner stated to Dr. Choi, "he will contact the surgeon when he is ready." | 3 at 187. |
| August 19, 2019 | Petitioner called Dr. Weiss' office to ask if "he should get his blood checked," because he is going to schedule his surgery. | 12 at 2. |
| August 20, 2019 | Petitioner's count "remained normalized." | 14 at 16. |
| September 4, 2019 | Petitioner underwent surgery. | 14 at 14. |

The letter that Dr. Choi submitted stated that "[d]ue to the persistent thrombocytopenia, the patient had hemorrhoidal surgery that had to be delayed until a higher [platelet] level was achieved. The patient underwent rituximab therapy for [four] doses which was completed on 12/12/2018 with subsequent resolution of the thrombocytopenia." Pet'r's Ex. 16 at 1. As Respondent noted, there is nothing in Petitioner's medical record that suggests a contraindication for Petitioner's surgery for a period of several months after the conclusion of his therapy. Furthermore, when given the opportunity to clarify the effect that ITP and corresponding treatment would have on Petitioner's ability to have colorectal surgery, Dr. Choi's letter only stated that the surgery had to be delayed until a higher level was achieved. The letter did not state that Petitioner had to delay his surgery for six months, or that such a delay needed to extend six months beyond the resolution of his symptoms.

Further, even assuming Petitioner's argument, it is unclear why the six-month delay would not have started either on December 12, 2018 (the day Petitioner concluded his therapy), or December 19, 2018 (the day Petitioner's platelet count was normalized). It is even more unclear why Dr. Choi would have contacted Dr. Weiss regarding Petitioner's platelet levels following initial normalization on December 19, 2018, if he intended to wait two more months before

beginning the clock on Petitioner's six-month delay. In fact, the record directly contradicts such an assertion, as Dr. Choi repeatedly noted in the record that Petitioner would undergo surgery once his platelet levels were higher, i.e., normalized. Dr. Choi's February progress note stated that his platelet levels had "remained normalized", as in, had been previously normal, and that Petitioner "will contact the surgeon when he is ready," not that Petitioner had been advised to wait any length of time prior to rescheduling the surgery. Pet'r's Ex. 3 at 187. Petitioner argued that *James-Cornelius* allows him to rely on his own statements as objective evidence to support reasonable basis. However, such is only true when his statements are corroborated by the medical record. Despite Petitioner's assertions, the record here instead contradicts Petitioner's explanation

Second, Petitioner pointed to the opinion and medical literature of Dr. Zizac; however, this opinion is not particularly helpful given the facts of the case and the timing of the filing. Furthermore, in coming to his opinion, Dr. Zizac did not review Petitioner's medical records, and instead relied solely on Petitioner's statement to understand the facts of the case. While it is true that Dr. Zizac did not need to review Petitioner's medical record to opine generally that rituximab therapy is a contraindication to colorectal surgery within six months, his admitted ignorance of Petitioner's medical record casts doubt on the applicability of his statements to the case at hand. As stated previously, an expert's opinion must be substantiated by facts in order for it to satisfy the reasonable basis inquiry. *See Perreira*, 33 F.3d at 1377. For example. Dr. Zizac cited to the American College of Rheumatology guideline to conclude that a six-month waiting period should follow rituximab therapy prior to elective surgery. Pet'r's Ex. 21 at ¶ 7. The literature that was filed in support of this contraindication is in the context of rheumatology patients suffering from chronic joint diseases: RA, SpA, JIA or SLE, who then undergo hip or knee (joint) surgery. *See* Pet'r's Ex. 19; *see also* Pet'r's Ex. 20. This literature specifically cautioned against expanding the guideline beyond these parameters and also noted that increased infection may only be associated with high-dose treatment regiments. Pet'r's Ex. 20 at 11. ITP was not mentioned in any of these articles, and Dr. Zizac did not explain how Petitioner's rituximab treatment for ITP prior to hemorrhoidal surgery is appropriately analogous to an RA patient undergoing knee surgery. Furthermore, he did not reconcile the discrepancy over whether and why the six-month delay should start at treatment conclusion, platelet normalization, or another treatment milestone after platelet normalization. Lastly, he did not explain why Petitioner was advised by her treater to wait an unspecified number of months, if indeed six months is the minimum appropriate amount of time. Given Dr. Zizac's reliance solely on Petitioner's own claims and the identified inconsistencies between Petitioner's account and the medical record, Dr. Zizac's opinion is insufficient to stand as objective evidence independently or in conjunction with the other filings, to satisfy the reasonable basis standard for attorneys' fees and costs.

Finally, Petitioner pointed to a note from November 14, 2018, during his hospitalization, that his surgery had been delayed due to his ITP. While this was certainly true during the acute stages of Petitioner's ITP and subsequent treatment, this note does nothing more than indicate that at that moment in time, less than one month post vaccination, Petitioner's surgery was canceled due to his ITP. It does not provide any explanation for the above-referenced contradictions between Petitioner's statements and the medical records, nor does it indicate the appropriate length of time to delay the surgery rescheduling. Indeed, other medical records and notes from Dr. Choi specifically indicated that Petitioner could resume his surgery once his platelets normalized,

something that was achieved on December 19, 2018, approximately one month later and two months post vaccination.

Although not directly addressed in Petitioner's initial briefs, I find it necessary still to address Petitioner's later argument that the Federal Circuit's decision in *Leming v. Sec'y of Health & Hum. Servs.* suggested his IVIG treatment constituted surgical intervention in the context of reasonable basis. *See* 98 F.4th 1107 (Fed. Cir. 2024). IVIG has previously been characterized as non-surgical in nature, and as explained in my prior decision in this case, I found Petitioner's argument to be without merit. Further, *Leming* was not decided until 2024, three years after Petitioner filed this claim. At the time of Petitioner's request for supplemental briefing to incorporate the *Leming* decision, all other briefing had been completed, and this case was awaiting my decision on its merits. This is a similar circumstance to the case in *Goodgame*, where the Court of Federal Claims upheld the special master's decision to give "negligible" weight to medical records filed at a late stage in the litigation in their reasonable basis analysis. 157 F.3d at 71. Notwithstanding my ultimate disagreement with Petitioner's interpretation of *Leming*, the fact that this decision would not exist until three years after Petitioner filed his claim makes it impossible to retroactively use the case as an example of why Petitioner's claim had reasonable basis at the time of its filing.

### VI.    Conclusion

It is in consideration of all these facts and circumstances that I find that Petitioner's medical records and other submitted evidence did not contain more than a mere scintilla of objective evidence that he suffered from the residual effects of the vaccine for more than six months. In accordance with the Federal Circuit's guidance in *Cottingham* and *James-Cornelius*, I find that Petitioner's claim lacked reasonable basis, and he is therefore not entitled to attorneys' fees and costs.[16]

**IT IS SO ORDERED.**

s/Herbrina D. S. Young
Herbrina D. S. Young
Special Master

---

[16] Pursuant to Vaccine Rule 11(a), entry of judgment is expedited by the parties' joint filing of a notice renouncing the right to seek review.